Slip Op. 17-92

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MONDELEZ GLOBAL LLC (SUCCESSOR TO CADBURY ADAMS USA, LLC),**<br><br>                  Plaintiff,<br><br>             v.<br><br>**UNITED STATES,**<br><br>                  Defendant. | **Before: Jane A. Restani, Judge**<br><br>**Court No. 12-00076** |

## OPINION

[Parties' cross-motions for summary judgment in customs classification matter are denied.]

Dated: July 25, 2017

Craig A. Lewis, Chandri Navarro, Michael Jacobson, and A. Elizabeth Korchin, Hogan Lovells US LLP, of Washington, DC, and A. Elizabeth Korchin, Hogan Lovells US LLP, of New York, NY, for plaintiff.

Jamie L. Shookman, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Civil Division, of New York, NY, for defendant. With her on the brief were Chad Readler, Acting Assistant Attorney General, Amy M. Rubin, Assistant Director, and Justin R. Miller, Senior Trial Counsel. Of counsel on the brief was Michael W. Heydrich, Office of Assistant Chief Counsel, U.S. Customs and Border Protection.

Restani, Judge: This matter is before the court on cross-motions for summary judgment made by plaintiff Mondelez Global LLC (Successor to Cadbury Adams USA, LLC) ("Mondelez"), an importer of gum base used in manufacturing chewing gum, and defendant United States ("the government"). See Def.'s Mem. in Supp. of the Mot. for Partial Summ. J. 1, ECF No. 63 ("Gov't Br."); Mem. of Law in Supp. of Pl.'s Opp'n to Def.'s Partial Mot. for Summ. J. & in Supp. of Pl.'s Cross Mot. for Summ. J. 1, ECF No. 69 ("Mondelez Br."). The

government argues that United States Customs and Border Protection ("Customs") properly classified the subject merchandise as a "food preparation" under subheading 2106.90.99 of the Harmonized Tariff Schedule of the United States[1] ("HTSUS"),[2] Gov't Br. at 5–15; Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. & in Reply to Pl.'s Resp. to Def.'s Partial Mot. for Summ. J. 6–15, 17–21, ECF No. 78 ("Gov't Resp."), and that gum base is not classifiable under heading 3824, HTSUS, Gov't Br. at 16; Gov't Resp. at 15–17.  Mondelez, however, asserts that the gum base is properly classified under subheading 3824.90.92, HTSUS, as a "chemical product[] and preparation[] of the chemical or allied industries,"[3] Mondelez Br. at 1–2, 24–27; Pl.'s Reply in Further Supp. of its Cross Mot. for Summ. J. 11–13, ECF No. 83 ("Mondelez Resp."), and not

---

[1] All citations to the Harmonized Tariff Schedule of the United States ("HTSUS") refer to the HTSUS at the time of importation, i.e. 2010.

[2] The relevant portion of Chapter 21 of the HTSUS reads:

    2106  Food preparations not elsewhere specified or included: . . .
    2106.90  Other: . . .
            Other: . . .
                Other: . . .
                    Other: . . .
                      Other: . . .
    2106.99  Other

[3] The relevant portion of Chapter 38 of the HTSUS reads:

    3824  Prepared binders for foundry moulds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included: . . .
    3824.90  Other: . . .
            Other: . . .
    3824.90.92  Other

under heading 2106, HTSUS, Mondelez Br. at 9–24; Mondelez Resp. at 4–11.[4] For the reasons stated below, the court denies both parties' motions for summary judgment.

## BACKGROUND

The following facts are undisputed. Gum base is an ingredient of finished chewing gum. Def.'s Statement of Undisputed Material Facts ¶ 6, ECF No. 63-1 ("Def.'s SUMF"); Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 6, ECF No. 69-1 ("Pl.'s Resp. to SUMF"). It is composed of "fillers, plasticizers, softeners, emulsifiers, antioxidants, and other chemicals." Pl.'s Statement of Undisputed Material Facts ¶ 7, ECF No. 69-2 ("Pl.'s SUMF"); Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 7, ECF No. 78-1 ("Def.'s Resp. to SUMF"). Gum base lacks any coloring, flavoring, or sweetener. Pl.'s SUMF ¶ 8; Def.'s Resp. to SUMF ¶ 8. Some of the subject merchandise's ingredients—hydrogenated oil, calcium carbonate, triacetin, and lecithin—have nutritive value when presented to the body in digestible form. Am. Compl. ¶ 24, ECF No. 58; Def.'s SUMF ¶¶ 9–10; Pl.'s Resp. to SUMF ¶¶ 9–10.[5] Gum base is not intended to be ingested, eaten, or swallowed. Pl.'s SUMF ¶ 12; Def.'s Resp. to SUMF ¶ 12. After importation, Mondelez adds flavor, sweetener, and color to the gum base to manufacture chewing gum. Def.'s SUMF ¶ 7; Pl.'s Resp. to SUMF ¶ 7.

In July of 2008, Customs issued ruling letter NYRL N031237 (July 10, 2008), available at 2008 WL 2944756 in response to a request by Mondelez's predecessor, Cadbury Adams USA, LLC ("Cadbury") as to the classification of gum base. In this ruling, Customs classified the

---

[4] In addition, if gum base is classifiable under both headings, the government contends that heading 2106, HTSUS, prevails under HTSUS General Rule of Interpretation ("GRI") 3(a), Gov't Resp. at 21–23, whereas Mondelez posits that heading 3824, HTSUS, controls under GRI 3(c), Mondelez Br. at 27–29.

[5] There are three forms of gum base at issue in this case, Def.'s SUMF ¶ 1; Pl.'s Resp. to SUMF ¶ 1, of which only one contains lecithin, Def.'s SUMF ¶¶ 2–4; Pl.'s Resp. to SUMF ¶¶ 2–4.

subject merchandise without discussion as a "food preparation" under subheading 2106.90.99. Id. at *1. Subsequently, in January and February of 2010, Cadbury made six entries of gum base from Ireland through the Port of Chicago, Illinois. Am. Compl. ¶ 14. Cadbury timely protested Customs' classification of these entries as food preparations, which protests Customs denied. Id. ¶¶ 34–35. Cadbury then filed this action challenging Customs' classification of the gum base.[6] Summons 1, ECF No. 1. Both parties now move for summary judgment pursuant to United States Court of International Trade ("USCIT") Rule 56. Gov't Br. at 1; Mondelez Br. at 1.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT Rule 56(a). In tariff classification cases, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998). The court reviews de novo Customs' classification decision. See 28 U.S.C. § 2640(a)(1); Telebrands Corp. v. United States, 865 F. Supp. 2d 1277, 1279–80 (CIT 2012).

## DISCUSSION

Tariff classification is governed by the General Rules of Interpretation ("GRIs"), which must be applied in numerical order. Wilton Indus., Inc. v. United States, 741 F.3d 1263, 1266 (Fed. Cir. 2013). GRI 1 states that "classification shall be determined according to the terms of

---

[6] Cadbury had previously filed a related action, Mondelez Global LLC (Successor to Cadbury Adams USA, LLC) v. United States, Court No. 11-00393. Summons 1–2, Court No. 11-00393 (CIT Sept. 27, 2011), ECF No. 1. The present case, Court No. 12-00076, was designated as a test case, and Court No. 11-00393 has been stayed pending disposition of the present case. Order, Jan. 1, 2016, ECF No. 45.

the headings and any relative section or chapter notes." When, as here, a tariff term "is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common meaning. A court may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities, to determine the common meaning of a tariff term." Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (internal citation omitted). A court should also refer to the Explanatory Notes ("ENs")[7] in classification cases, which "provide persuasive guidance and 'are generally indicative of the proper interpretation,' though they do not constitute binding authority." Schlumberger Tech. Corp. v. United States, 845 F.3d 1158, 1164 (Fed. Cir. 2017) (quoting Kahrs Int'l, Inc. v. United States, 713 F.3d 640, 645 (Fed. Cir. 2013).

**I.        Heading 2106, HTSUS (Customs' Claimed Classification)**

    A.        Government's Construction of "Food Preparation"

The government contends that gum base is a "food preparation" under heading 2106 because chewing gum is a "food," a "preparation" is a substance specially prepared for a particular application, and gum base is used exclusively for manufacturing chewing gum, itself a food. Gov't Br. at 6–12; Gov't Resp. at 10–15. Relying on Franklin v. United States, 289 F.3d 753, 760–61 (Fed. Cir. 2002), Mondelez responds that heading 2106 covers only products that are themselves "consumed as food," not those simply used in food, and that gum base is not "consumed as food." Mondelez Br. at 9–18. Mondelez also argues that the ENs for HS heading 21.06 weigh against the inclusion of gum base in that heading because gum base falls under a

---

[7] The ENs to the Harmonized Commodity Description and Coding System ("HS"), of which the HTSUS is an embodiment, are published by the World Customs Organization. See Tyco Fire Prods, Ltd. P'ship. v. United States, 841 F.3d 1353, 1356 (Fed. Cir. 2016); Chemtall, Inc. v. United States, 179 F. Supp. 3d 1200, 1203 (CIT 2016).

different heading, and gum base is neither "for human consumption" nor "valued for its nutritional qualities." Id. at 18–24.

Products are not classifiable under heading 2106, HTSUS, merely because they are specifically made for use in food. The government is correct that the word, "preparation," in this context means "a substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine, or in the arts or sciences." See Orlando Food Corp. v. United States, 140 F.3d 1437, 1441 (Fed. Cir. 1998) (quoting The Oxford English Dictionary 374 (2d ed. 1989)); Nestle Refrigerated Food Co. v. United States, 18 CIT 661, 673–74 (1994) ("The term 'preparation' has been defined as 'something that is prepared: something made, equipped, or compounded for a specific purpose . . . .'") (quoting Preparation, WEBSTER'S THIRD NEW INT'L DICTIONARY 1790 (unabridged 1993)); abrogated on unrelated grounds Orlando Food, 140 F.3d at 1440.[8] But, the government's construction of the phrase, "food preparation," runs counter to its common meaning. The phrase "food preparation" is simply an attributive noun, "food," followed by another noun, "preparation." Similarly to how the attributive noun "chicken" in the phrase "chicken soup" describes what type of soup is meant, the word "food" simply specifies what type of "preparation" is covered by heading 2106, HTSUS.

The government's arguments to the contrary are unpersuasive. First, the government cites Orlando Food and Nestle as support for its construction of heading 2106, HTSUS, but these cases analyzed materially different headings—ones that covered "preparations" for something, rather than "preparations" of something. Gov't Br. at 8–9; see Orlando Food, 140 F.3d at 1441

---

[8] The government does not explicitly state, but apparently contends, that a product is "specifically prepared for use in food" only if it is "used exclusively" in food. Gov't Resp. at 10–11.

(analyzing a heading covering "sauces and preparations therefor"); Nestle, 18 CIT at 673–74 (interpreting a heading covering "[p]reparation for sauce").[9]  Indeed, the difference between the heading in those cases and heading 2106, HTSUS, highlights the failure of the government's argument.  The HTSUS is rife with headings and subheadings that distinguish between preparations for something, and preparations in and of themselves.[10]  If heading 2106, HTSUS, were intended to cover "preparations for food," the HTSUS could have said so.  Cf. Whitfield v. United States, 543 U.S. 209, 216 (2005) (reasoning that Congress's inclusion of an express overt-act requirement in twenty-two different conspiracy statutes meant that Congress did not intend such requirement to be included in a statute lacking one).  Second, the government relies on past Customs rulings in which Customs "classified preparations employed in the processing and manufacture of foods and beverages under heading 2106."  Gov't Br. at 10 n.6.  But, such arguments fall short because no ruling cited by the government explicitly relied on the

---

[9] Arbor Foods, Inc. v. United States, 30 CIT 670, 677–78 (2006), cited by the government, does not aid the inquiry here.  In that case, "neither party contest[ed] that the [sugar and gelatin] blend f[ell] within the definition of food preparation because it [was] used to make confections and other gelatin-based desserts."  This indicates the parties believed the subject merchandise was classified under heading 2106, HTSUS, solely because, in accordance with the government's interpretation, the subject merchandise was used in food.  But, this single sentence noting the parties' understanding of the heading does little for the government's argument, given that the court in Arbor Foods did not have the occasion, as it does now, to consider the meaning of heading 2106 in a contested setting.

[10] For instance, in the latter category are "[o]ther [pasta], including pasta packaged with sauce preparations," subheading 1902.11.40, HTSUS; "[c]hocolate and other food preparations containing cocoa," heading 1806, HTSUS; and "[p]re-shave, shaving or after shave preparations," heading 3307, HTSUS.  Examples of the former category include "[s]oups and broths and preparations therefor," heading 2104, HTSUS; "[m]ixes and doughs for the preparation of bakers' wares of heading 1905," subheading 1901.20, HTSUS; and "other animal products used in the preparation of pharmaceutical products," subheading 0510.00, HTSUS.  This distinction in language is further highlighted by heading 2104, HTSUS, which covers both "[s]oups and broths and preparations therefor" and "homogenized composite food preparations."

incorporation of the subject merchandise into food to classify the subject merchandise under heading 2106, HTSUS. See NYRL N196776 (Jan. 19, 2012), available at 2012 WL 421493; NYRL N186795 (Oct. 28, 2011), available at 2011 WL 5829228; NYRL N171670 (July 5, 2011), available at 2011 WL 3473014; HQ W967896 (Feb. 5, 2008), available at 2008 WL 2610983; HQ 965805 (Oct. 7, 2002), available at 2002 WL 32097162. And indeed, each product at issue in these rulings appears to be a "food," which term is discussed below, in its own right. See, e.g., NYRL N171670 (classifying "Orange Jelly Balls" under heading 2106, HTSUS).[11] Third, the ENs to HS heading 21.06 do not support the government's contention that a product is a "food preparation" simply because it is specifically manufactured for use in food.[12] Thus, a

---

[11] In its opposition to the government's construction of "food preparation," Mondelez cites several Customs rulings in which Customs classified a product ultimately used in food under a heading other than 2106, HTSUS. Mondelez Br. at 12–14; see NYRL N063515 (July 29, 2009), available at 2009 WL 2488977; NYRL N061200 (May 29, 2009), available at 2009 WL 1915895; NYRL G82028 (Jan. 18, 2001), available at 2001 WL 359794. These rulings are of limited value, however, given that they include no discussion as to why the products at issue were not classified under heading 2106, HTSUS. The government merely contends that a product used in food can be classified under heading 2106, HTSUS, not that it always must be classified there.

[12] The Explanatory Notes to HS heading 21.06 provide that the heading covers:

> (A) Preparations for use, either directly or after processing (such as cooking, dissolving or boiling in water, milk, etc.), for human consumption.
> (B) Preparations consisting wholly or partly of foodstuffs, used in the making of beverages or food preparations for human consumption. The heading includes preparations consisting of mixtures of chemicals (organic acids, calcium salts, etc.) with foodstuffs (flour, sugar, milk powder, etc.), for incorporation in food preparations either as ingredients or to improve some of their characteristics (appearance, keeping qualities, etc.) (see the General Explanatory Note to Chapter 38).

EN Ch. 21 at IV-2106-1 (2007). All citations to the ENs are to the 2007 version, the most recently promulgated edition at the time of importation.
　　As the government notes, paragraph (A) brings under heading 2106, HTSUS, "substances that are [] themselves 'for human consumption.'" Gov't Resp. at 13 (emphasis added).

(continued . . .)

product is not classifiable under heading 2106, HTSUS, merely because it is specially prepared for use in food, instead the preparation must itself be food. See also Drygel, Inc. v. United States, 31 CIT 1319, 1328, 507 F. Supp. 2d 1371, 1380 (2007), rev'd on other grounds, 541 F.3d 1129 (Fed. Cir. 2008) (limiting "food preparations" under heading 2106, HTSUS, to "substances prepared for human consumption."). Accordingly, the government's motion for summary judgment on its construction of heading 2106, HTSUS, is denied.

  B.  Common Meaning of "Food Preparation"

    *1.*  *Construction*

Having concluded that a product may be classified under heading 2106, HTSUS, only if it is a "preparation" that is "food," the court turns to the question of the common meaning of "food" under heading 2106, HTSUS.[13] See GRI 1. The government never directly defines "food," but appears to hold to the following definition— a "food" need not be "edible," a term which the government describes as "suitable for human consumption," see Gov't Resp. at 14, need not be swallowed or ingested, see Gov't Br. at 13–14, and need not provide nutritive value in digestible form or even have nutrition at all, although the government states that if a product does have nutritive value then it is a "food," see id. at 11–12 n.8; Gov't Resp. at 7–8, 16. The only requirement the government would impose is that "food" must be "for human

---

Although paragraph (B)'s language of "used in the making of . . . food preparations" seems to lend some support to the government's contention, paragraph (B) applies only to preparations consisting "wholly or partly of foodstuffs." EN Ch. 21 at IV-2106-1. Thus, paragraph (B) does not capture a product solely because it is specially made for use in food. Furthermore, paragraph (B) appears intended to note that a preparation "for human consumption," that is, as discussed below, a "food," need not itself be composed entirely of classic "foodstuffs" such as flour and sugar, but can also contain items commonly described as "chemicals." (Although the court notes that, of course, even food is composed of chemicals.)

[13] Other than disputing whether a "food preparation" covers something specially prepared for use in food, the parties do not argue over whether gum base is a "preparation."

Case 1:12-cv-00076-JAR   Document 84   Filed 07/25/17   Page 10 of 17
Court No. 12-00076                                                                                      Page 10

consumption," which the government defines as "the act of consuming, as by use, decay, or destruction."  See Gov't Br. at 10 (defining "consumption"); Gov't Resp. at 13–14.  Mondelez on the other hand seems to define "food" as a substance that is intended to be ingested.  See Mondelez Br. at 9–11, 20, 22; Mondelez Resp. at 6, 9.  Mondelez reads the case law and ENs' references to "edible," "for human consumption," and "consumed as food" to be merely myriad ways of describing this same definition of food.[14]  See Mondelez Br. at 9–11, 20, 22; Mondelez Resp. at 6, 9.  Mondelez qualifies its definition by noting that some substances, for example, tea and a bouquet garni, are "consumed as food" because they impart flavor or nutrients without themselves necessarily being ingested.  Mondelez Br. at 14 n.10.  Of course, some compounds from the tea and bouquet garni become part of the ingested food, and that is their chief purpose.

The common meaning of "food" is that of a substance that is intended to be ingested.  See Franklin, 289 F.3d at 760–61 (concluding that a sand coral packet used to purify water was not a "food preparation" under heading 2106, HTSUS, because no evidence suggested the product itself was consumed as food); EN Ch. 21 at IV-2106-1 (stating that a "preparation" only qualifies as a "food preparation" if it is "for human consumption");[15] Food, OXFORD ENGLISH

---

[14] Mondelez provides a table in its opening brief that seems to indicate a distinction between the concepts of "food" and "edible."  See Mondelez Br. at 15−16.  But, elsewhere, Mondelez makes clear that it believes these ideas to be indistinguishable.  See Mondelez Resp. at 9 (stating that Franklin "found that merchandise must be edible to be 'consumed as food'"); Mondelez Br. at 22 ("[T]he USCIT has equated 'for human consumption' with being 'edible.'").

[15] The phrase "consumed as a food" in Franklin, 289 F.3d at 761 and "for human consumption" in the ENs to HS heading 21.06 refer to the substance being intended to be ingested, as opposed to the government's preferred definition of "consumption" as "the act of consuming, as by use, decay, or destruction."  See Consume, AMERICAN HERITAGE DICTIONARY, available at https://ahdictionary.com/word/search.html?q=consume&submit.x=0&submit.y=0 (last visited July 20, 2017) (defining "consume" as "[t]o take in as food; eat or drink up"); Consume, OXFORD ENGLISH DICTIONARY, available at http://www.oed.com/view/Entry/39973?rskey=8Wko6X&result=1#eid (last visited July 20,
(continued . . .)

DICTIONARY, available at http://www.oed.com/view/Entry/72632?rskey=McgZSa&result=1#eid (last visited July 20, 2017) (including in the definition of food a requirement "that people or animals eat or drink" the substance). But, a preparation that itself is not ingested in the classic sense is nonetheless a food if its purpose is to impart flavor or nutrition into a substance that is ingested. See Franklin, 289 F.3d at 761 (noting that herbal infusions and teas are "food preparation[s]" even though they are not "consumed as food" and holding that a coral sand packet's impartation of hardness and alkalinity into water did not qualify it as a "food preparation"); EN Ch. 21 at IV-2106-3 (stating that "herbal infusions" and "herbal 'teas'" are food preparations).

Although some dictionaries also require that a substance provide nutrition for it to be a "food," see, e.g. Food, OXFORD ENGLISH DICTIONARY (defining food as "[a]ny nutritious substance that people or animals eat or drink in order to maintain life and growth"), substances can be "food" for tariff classification purposes even if they do not provide nutrition. Neither Franklin nor the ENs require a nutrition analysis, thus, neither party argues that providing nutrition is a necessary condition for a product to be a food. Furthermore, as demonstrated by this case, such analysis would increase the cost of resolving tariff disputes due to the laboratory experiments required to determine if a product provides nutrition. Although the government claims that being a vehicle for delivering nutrition is a sufficient condition for a substance to be a "food," the common meaning of "food" requires that the substance be ingested.

The parties agree that gum base is not intended to be ingested. Pl.'s SUMF ¶ 12; Def.'s Resp. to SUMF ¶ 12. Thus, gum base is not to be classified under heading 2106, HTSUS, unless

---

2017) (defining "consume" as "[t]o eat or drink; to ingest"). If a food were simply something that is done away with by the human mouth, as the government seems to contend, clearly non-food products such as toothpaste and cigarettes could qualify as "food preparations."

like tea leaves or bouquet garni it is intended to leach flavor or any nutritive compounds it contains to be then ingested themselves. No party argues that gum base provides flavor. See Pl.'s SUMF ¶¶ 8, 14; Def.'s Resp. to SUMF ¶¶ 8, 14. So, the question is, does gum base contain and is it intended to provide nutritive compounds to be ingested?

### 2.  *Application to Gum Base*

The court declines to rule at this time on the purpose that gum base's only nutritive ingredients—vegetable oil, calcium carbonate, lecithin, and triacetin—serve. Mondelez contends that the court should rule on its summary judgment motion now because the government has shown nothing more than a "'speculative hope' of finding evidence to support [its] claim." Mondelez Resp. at 15 (quoting Brubaker Amusement Co., Inc. v. United States, 304 F.3d 1349, 1361 (Fed. Cir. 2002)). The government responds that it has not had "adequate time for discovery." Gov't Resp. at 1 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); see also Def.'s Resp. to SUMF at 1 (stating "that the Government has not had an adequate opportunity to develop [its position] in discovery . . . [T]he parties jointly moved to keep discovery open pending the resolution of the Government's [partial] motion [for summary judgment]. Therefore, if the Court denies the Government's motion, the Government would request that the Court refrain from deciding Mondelez's motion for summary judgment without first allowing the Government to probe the facts asserted in [Mondelez's statement of facts].").

The government moved for summary judgment prior to discovery's close to avoid expenses associated with proving that gum base's ingredients are released from chewing gum and subsequently digested. Def.'s Partial Mot. for Summ. J. 2–3, ECF No. 63 ("Gov't Summ. J. Mot."). The government should not, in effect, be punished for attempting to save expenses. Although Mondelez has submitted evidence supporting its contention that "[e]ach of the

components of gum base are added for structural, tactile, cohesion, or preservation purposes" and that "[n]one of the constituent ingredients of gum base are included for a nutritional purpose," and the government has not submitted evidence to the contrary, the government should have the opportunity to do so. See Pl.'s SUMF at ¶¶ 9–10.[16]  Indeed, the government has "yet to complete depositions or discuss the necessity for expert witnesses." Gov't Summ. J. Mot. at 2.

## II.     Heading 3824, HTSUS (Plaintiff's Claimed Classification)

The government argues that gum base is excluded from heading 3824, HTSUS, because it is included in heading 2106, HTSUS. Gov't Br. at 16. The government also contends the ENs exclude gum base from heading 3824, HTSUS, because gum base has nutritional value, and this nutritive value is not "incidental" to its function because the nutritive value of gum base did not occur "merely by chance." Gov't Resp. at 16–17. Mondelez counters that Note 1(b) to Chapter 38 of the HTSUS does not exclude gum base from heading 3824, HTSUS, because gum base has no nutritive value, given that its nutritive ingredients, although nutritive when consumed independently, are not digested when chewing gum is chewed. Mondelez Br. at 24 & n.17. Mondelez also asserts that, even if gum base has nutritive value, the "mere presence" of nutritive ingredients in gum base does not exclude it from heading 3824, HTSUS. Mondelez Br. at 23, 26 n.19; Mondelez Resp. at 13.

Heading 3824, HTSUS, covers, inter alia, "chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included." Note 1(b) to Chapter 38 of the HTSUS provides that Chapter

---

[16] For instance, Mondelez cites an expert report that "[e]ach of the components of gum base is added for structural, tactile, cohesion, or preservation purposes" and that "[n]one of the three subject gum bases includes any ingredient that is added for nutritional purposes." Decl. & Expert Report of Glenn Visscher, Ph.D. ¶¶ 13, 19, ECF No. 69-4 ("Visscher Rep.").

38 does not cover "[m]ixtures of chemicals with foodstuffs or other substances with nutritive value, of a kind used in the preparation of human foodstuffs (generally, heading 2106)." The heading is further explained by the ENs. First, the General EN to HS Chapter 38 states that

> The mere presence of 'foodstuffs or other substances with nutritive value' in a mixture would not suffice to exclude the mixture from Chapter 38, by application of Note 1(b). Substances having a nutritive value that is merely incidental to their function as chemical products, e.g., as food additives or processing aids, are not regarded as 'foodstuffs or substances with nutritive value' for the purpose of this Note. The mixtures which are excluded by virtue of Note 1(b) are those which are of a kind used in the preparation of human foodstuffs and which are valued for their nutritional qualities.

EN from Chapter 38 at VI-38-3. Second, EN(B) to HS heading 38.24, says that

> the heading does not cover mixtures of chemicals with foodstuffs or other substances with nutritive value, of a kind used in the preparation of certain human foodstuffs either as ingredients or to improve some of their characteristics (e.g., improvers for pastry, biscuits, cakes and other bakers' wares), provided that such mixtures or substances are valued for their nutritional content itself.

EN Ch. 38 at VI-3824-2.

Products that are mixtures of chemical products with "foodstuffs or other substances with nutritive value" are excluded from heading 3824, HTSUS, only if the mixture is valued for its nutritional content. Although Note 1(b) to Chapter 38 of the HTSUS is somewhat ambiguous, the ENs, which "are generally indicative of the proper interpretation," Schlumberger Tech. Corp., 845 F.3d at 1164 (quoting Kahrs Int'l, Inc., 713 F.3d at 645), clarify the matter. See EN Ch. 38 at VI-38-3 ("The mixtures which are excluded from Chapter 38 by virtue of Note 1(b) are those which are of a kind used in the preparation of human foodstuffs and which are valued for their nutritional qualities.") (emphasis added).[17] A necessary question to be resolved in deciding

---

[17] As long as a product prima facie falls under Chapter 38, which gum base does, and is not valued for its nutritional qualities, a product is not excluded from heading 3824, HTSUS, merely because it is used in a food preparation. See EN Ch. 38 at VI-3824-3, 5 (listing "[s]orbitol other
(continued . . .)

whether gum base is excluded from heading 3824, HTSUS, then, is whether gum base is valued for its nutritive properties.[18] This is essentially the same question to be resolved with respect to heading 2106, HTSUS.

Mondelez also makes a separate argument that it is entitled to summary judgment on the classification of gum base under heading 3824, HTSUS, because gum base's nutritive ingredients are not released during the chewing process. Mondelez Resp. at 11–12. Mondelez correctly notes that if a product <u>has</u> nutritive ingredients but does not release these ingredients, then the mixture does not have "nutritive value" for purposes of Note 1(b) to Chapter 38 because inherent in a product <u>having</u> nutrition is that it <u>provides</u> nutrition. <u>Id.</u> at 12; <u>see</u> <u>Nutrition</u>, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-

---

than that of heading 29.05," "[s]alt for curing or salting," and "[p]reparations used mainly for clarifying wines and other fermented beverages" as examples of products classifiable under heading 38.24." Thus, even though gum base is used in a food, gum, this fact does not on its own exclude gum base from heading 3824, HTSUS. <u>See</u> subheading 1704.10.00, HTSUS (classifying "[c]hewing gum" under a heading for "[s]ugar confectionary"); subheading 2106.90.99, HTSUS (classifying "gums . . . containing synthetic sweetening agents (e.g., sorbitol) instead of sugar" under heading 2106, HTSUS).

[18] A possibly separate, but ultimately indistinguishable question, is whether gum base's nutritive properties are "incidental" to its other functions. This possible threshold question derives from the General EN to Chapter 38's sentence that "[s]ubstances having a nutritive value that is merely incidental to their function as chemical products, e.g., as food additives or processing aids, are not regarded as 'foodstuffs or substances with nutritive value' for the purpose of this Note." EN Ch. 38 at VI-38-3. Mondelez contends this is a separate inquiry from whether the substance is valued for its nutritional properties. <u>See</u> Mondelez Resp. at 13. The government, meanwhile posits that "incidental" means "without intention." <u>See</u> Gov't Resp. at 16–17. "Incidental" here, however, means "[o]f a minor, casual, or subordinate nature," rather than "without intention," given that the ENs' language refers to the substance's nutritive value being "incidental <u>to</u>" other functions rather than being "incidental" in general. <u>See</u> <u>Incidental</u>, AMERICAN HERITAGE DICTIONARY, <u>available at</u> https://ahdictionary.com/word/search.html?q=incidental (last visited July 20, 2017); EN Ch. 38 at VI-38-3. Given this meaning of "incidental," regardless of whether the "incidental" question is technically a separate inquiry from whether the product is valued for its nutritive properties, the analysis is the same.

webster.com/dictionary/nutrition?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited July 20, 2017) (defining nutrition as "the sum of the processes by which an animal or plant takes in <u>and utilizes</u> food substances") (emphasis added); <u>Nutrition</u>, AMERICAN HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=nutrition (last visited July 20, 2017) (defining "nutrition" as [t]he process of nourishing or being nourished, especially the process by which a living organism <u>assimilates food and uses it</u> for growth and for replacement of tissues.") (emphasis added).  Without a substance having "nutritive value," there is, of course, no need to consider whether the substance is valued for its nutritive ingredients.  Here, although Mondelez has submitted evidence that gum base's nutritive ingredients are not released from gum base during the chewing of chewing gum, <u>see</u> Decl. & Expert Report of Glenn Visscher, Ph.D. ¶¶ 10, 18, 22–23, ECF No. 69-4, summary judgment is not appropriate on this issue at this time.  The government contends that nutrients in gum base may be released during chewing, and indeed, the reason it moved for summary judgment was to avoid the costs associated with determining this fact.  <u>See</u> Gov't Summ. J. Mot. at 2; Def.'s Resp. to SUMF ¶ 16 (averring that "the Government has not had an adequate opportunity to fully test or probe the evidence that Mondelez cites in support of [its statement that '[g]um base is non-nutritive']").

      Whether the chewing process releases nutrients is a necessary but not sufficient fact to sustain the government's classification.  As discussed above, the government must establish that gum base is valued for its nutritive properties or that the nutritive value is not incidental.  Given the government's approach to this litigation it may decide against trying to prove that nutrition is not incidental or that nutrition is a valuable aspect of the gum base.  The bare existence of nutritive properties will not win the day.

## CONCLUSION

For the foregoing reasons, the parties' summary judgment motions are denied. The government shall advise within 10 days whether it desires discovery. If no further discovery is desired Mondelez will prevail on its uncontroverted evidence that gum base lacks nutritive value and that any nutritive value is incidental to the gum base's functions. Any discovery shall be completed no later than 60 days from the date of this opinion.

      /s/ Jane A. Restani
      Jane A. Restani
      Judge

Dated: July 25, 2017
      New York, New York